**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WILLIAM E. HOOKER,

    Plaintiff,

v.

NOVO NORDISK, INC.,

    Defendant.

Civil Action No. 16-4562 (MAS) (TJB)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

This matter comes before the Court upon Defendant Novo Nordisk, Inc.'s ("Defendant") Motion for Summary Judgment on Plaintiff William E. Hooker's ("Plaintiff") claims alleging age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA"); New Jersey's Law Against Discrimination, N.J. Stat. Ann. §§ 10:5–1, *et seq.* ("NJLAD"), and 42 U.S.C. § 1981. (Def.'s Mot., ECF No. 29.) Plaintiff opposed (Pl.'s Opp'n, ECF No. 54), and Defendant replied (Def.'s Reply, ECF No. 60). The Court has carefully considered the parties' arguments and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1. For the reasons set forth herein, Defendant's Motion for Summary Judgment is granted.

**I.    FACTS**

    **A.    Undisputed Facts**

This matter arises from Defendant's termination of Plaintiff's employment on August 6, 2015. (Def.'s Statement of Undisputed Material Facts ("SUMF") ¶ 127, ECF No. 29-2; Pl.'s

Responses to Def.'s Statement of Undisputed Facts ("RSUF") ¶ 127, ECF No. 55.) Defendant is a subsidiary of Novo Nordisk, A/S, a global enterprise in "the sale and marketing of insulin and diabetes-care products," and is located in Plainsboro, New Jersey. (SUMF ¶ 1; RSUF ¶ 1.) Defendant hired Plaintiff as a Manager of Strategic Sourcing in August 2006, when he was fifty-four years old. (SUMF ¶¶ 6–8; RSUF ¶¶ 6–8.) Plaintiff was responsible for "conducting spend analysis and relevant analytical tasks to support and justify sourcing direction and related activity, developing supplier selection criteria and facilitating team members through the sourcing process, and identifying, pursuing, and maximizing opportunities to realize cost savings for the company." (SUMF ¶ 8; RSUF ¶ 8.) In 2008, Plaintiff was promoted to Senior Manager, Strategic Sourcing, a senior managerial position, by Defendant's Senior Director, Strategic Sourcing ("Senior Director"), Bernard Wright ("Wright"). (SUMF ¶ 9; RSUF ¶ 9.) In this role, Plaintiff was tasked with "managing sourcing projects for the organization, as well as creating [Defendant's] 'supplier diversity' program." (SUMF ¶ 10; RSUF ¶ 10.)

### 1. Karsten Knudsen

In 2010, Karsten Knudsen ("Knudsen"), "a native of Denmark and employee of [Defendant's] parent company, [] came to the United States" as Defendant's President of Finance. (SUMF ¶ 11; RSUF ¶ 11.) Shortly thereafter, Wright was terminated. (SUMF ¶ 13; RSUF ¶ 13; *see also* Pl.'s Supplemental Statement of Material Facts ("SSMF") ¶ 12, ECF No. 54; Def.'s Resp. to Pl.'s Counterstatement of Material Facts ("RCMF") ¶ 12, ECF No. 60-1.) For five months, from January 6, 2012, through June 4, 2012, Knudsen served as Plaintiff's immediate supervisor. (SUMF ¶¶ 13–14, 24; RSUF ¶¶ 13–14, 24.) During this time, Plaintiff applied for the open Senior Director position, formerly occupied by Wright, but external candidate Richard Houtz ("Houtz")

was hired to fill the position instead. (SUMF ¶ 17(a); RSUF ¶ 17(a).)[1] Houtz was more qualified for the Senior Director position than Plaintiff. (SUMF ¶ 16(b); RSUF ¶ 16(b).)

Knudsen wanted to "take the procurement operation in a new direction and expand the Senior Director role to support 'the savings potential that [the department] had to bring to the table.'" (SUMF ¶ 17(b) (alteration in original); RSUF ¶ 17(b).) When Knudsen informed Plaintiff of Houtz's hire, Knudsen said he "wanted to bring some 'fresh blood' into the organization." (SUMF ¶ 18; RSUF ¶ 18.) Plaintiff interpreted Knudsen's statement to mean that Knudsen wanted a younger workforce, but "it is undisputed that Knudsen never said anything specific about wanting 'younger blood' in the organization." (SUMF ¶ 19; RSUF ¶ 19.) Plaintiff based his interpretation on a statement made by another executive of Defendant's parent company, Jesper Brandgaard ("Brandgaard"), that "Novo Nordisk was 'a very young organization,' but likes its 'older people too because they can come in and train the younger people.'" (SUMF ¶ 21; RSUF ¶ 21.)

Shortly after Houtz was hired, Plaintiff received his mid-year review from Knudsen. (SUMF ¶¶ 25, 28; RSUF ¶¶ 25, 28.) Knudsen informed him that "'things were okay' but [Plaintiff's] savings for the first half of 2012 were below expectations." (SUMF ¶ 26; RSUF ¶ 26.) "Mr. Knudsen also told Plaintiff to reallocate more of his time from supplier diversity to general category management." (SUMF ¶ 27; RSUF ¶ 27.)

On February 20, 2013, Plaintiff met with Defendant's Human Resources representative Michele Petracca, and shared that he believed Knudsen "was discriminating against him because of his age." (SUMF ¶ 43; RSUF ¶ 43.) Shortly thereafter, Defendant hired third-party counsel Suzanne Marasco, who interviewed Plaintiff, Knudsen, and Houtz. (SUMF ¶¶ 50–51; RSUF

---

[1] Defendant's SUMF includes two statements designated each as fifteen, sixteen, and seventeen. Plaintiff acknowledges this error but does not distinguish between them. (See RSUF ¶ 15 n.2.) For clarity, the Court references the first iteration of each number as (a), and the second as (b).

3

¶¶ 50–51.) Counsel returned a report that she did not uncover evidence of discrimination against Plaintiff. (SUMF ¶¶ 52–53; RSUF ¶¶ 52–53.)

### 2. Richard Houtz

On June 4, 2012, Houtz began as Defendant's Senior Director. (SUMF ¶ 24; RSUF ¶ 24.) "Plaintiff felt Mr. Houtz was a strong director, and Mr. Houtz never made any comments to Plaintiff or anyone else that Plaintiff felt were discriminatory." (SUMF ¶ 29; RSUF ¶ 29.) In February 2013, Houtz delivered Plaintiff's 2012 performance review and informed him that "2012 was a great year overall for the Procurement Department, but Plaintiff's personal contributions to [Defendant's] business priorities were below expectations." (SUMF ¶ 38; RSUF ¶ 38.) Houtz thereafter placed Plaintiff on a formal "Action Plan." (SUMF ¶ 41; RSUF ¶ 41.) Plaintiff responded by emailing Houtz that he felt "blindsided" by his year-end performance review because "[w]hile there were comments made regarding [Plaintiff's] need to strengthen [his] Sourcing activities, [he] thought [he] had done just that." (SUMF ¶ 42 (quoting Ex. C to Def.'s Mot., Hooker I Dep., 123:18–24; 126:21–127:23; Ex. K); RSUF ¶ 42.)

Plaintiff's three-month Action Plan commenced on April 17, 2013. (SUMF ¶ 54; RSUF ¶ 54.) The Action Plan required that Plaintiff "increase his ability to influence and persuade internal customers, demonstrate $2 million in savings by the end of the Action Plan, and dedicate 80% of his time to stakeholder management, category strategy development, strategic sourcing execution, and overall supplier management, with 20% devoted to the supplier diversity initiative." (SUMF ¶ 55; RSUF ¶ 55.) On July 26, 2013, Houtz informed Plaintiff that his Action Plan was being extended until September 2, 2013, because he had not met his savings goal of two million dollars. (SUMF ¶ 57; RSUF ¶ 57.) In response, Plaintiff wrote to Houtz that he felt Houtz to be

"moving the goal posts" to achieve "Knudsen's vision of getting new blood into the organization." (SUMF ¶ 58 (internal quotation marks omitted); RSUF ¶ 58.)

### 3. Michael Hicks

In or around July 2013, Michael Hicks ("Hicks") was promoted to Associate Director, Category Management, and replaced Houtz as Plaintiff's immediate supervisor. (SUMF ¶ 59; RSUF ¶ 59.) "Mr. Hicks never made any comments to Plaintiff that Plaintiff felt were discriminatory." (SUMF ¶ 60; RSUF ¶ 60.) "Nor did Plaintiff witness Mr. Knudsen or any other [Novo Nordisk] employee make any negative comments regarding age at any time after Mr. Hicks became Plaintiff's supervisor in July 2013." (SUMF ¶ 61; RSUF ¶ 61.)

In November 2013, Plaintiff was removed from the Action Plan to permit Hicks to make an independent determination as Plaintiff's new supervisor. (SUMF ¶ 67; RSUF ¶ 67.) "By Plaintiff's 2014 year-end review, however, Mr. Hicks had concluded that Plaintiff's performance needed significant improvement." (SUMF ¶ 82; RSUF ¶ 82.) Plaintiff received an "Approaches Expectations" rating during his 2014 year-end performance review, and was subsequently placed on a new Action Plan. (SUMF ¶¶ 89, 90; RSUF ¶¶ 89, 90.) Plaintiff also received a verbal warning, which identified circumstances wherein Plaintiff did not demonstrate an understanding of basic procurement concepts. (SUMF ¶ 91; RSUF ¶ 91.) Plaintiff "submitted a written response to the verbal warning and Action Plan on March 9, 2015," in which he wrote that "he had yet to secure the same firm footing, but that with a little patience and more contemporaneous coaching, his performance in 2015 [would] exceed everyone's expectations." (SUMF ¶¶ 94–95 (internal quotation marks omitted); RSUF ¶¶ 94–95.) He also stated that he was "wary of reprisal given the events of two years ago when he felt he had exposed Mr. Knudsen for trying to prune older workers

from the organization, but he would make every effort to meet [Mr. Hicks'] expectations." (SUMF ¶ 96 (alteration by second source) (internal quotation marks omitted); RSUF ¶ 96.)

Plaintiff's second Action Plan required Plaintiff to complete two projects: a Medical Communications Request for Proposal and a Promotional Materials Ordering Project. (SUMF ¶¶ 99–101; RSUF ¶¶ 99–101.) By the end of Plaintiff's Action Plan, Hicks stated that "Plaintiff had not sufficiently improved in exercising his analytical skills and independently producing results in projects requiring those skills." (SUMF ¶ 103; RSUF ¶ 103.) On May 21, 2015, Hicks gave Plaintiff a written warning and "advanced him from the Action Plan to a [Performance Improvement Plan ("PIP")]." (SUMF ¶ 108; RSUF ¶ 108.) Plaintiff responded in writing, stating that "he [could not] understand why advancing the [A]ction [P]lan to a PIP [was] warranted." (SUMF ¶ 109; RSUF ¶ 109.)

On July 6, 2015, Plaintiff requested that Hicks remove him from the PIP "due to what Plaintiff felt were performance improvements." (SUMF ¶ 110; RSUF ¶ 110.) On July 28, 2015, Hicks contacted Human Resources and "recommended terminating Plaintiff's employment." (SUMF ¶ 122; RSUF ¶ 122.) On August 6, 2015, Hicks met with Plaintiff and a Human Resources representative and "advised Plaintiff of the termination of his employment." (SUMF ¶ 127; RSUF ¶ 127.)

"After the termination of Plaintiff's employment, Mr. Hicks hired an employee named Eric Sobel to replace Plaintiff." (SUMF ¶ 130; RSUF ¶ 130.) "Mr. Sobel was 53 years old at the time that Mr. Hicks offered him Plaintiff's former position." (SUMF ¶ 131; RSUF ¶ 131.)

**B.** **Disputed Facts**

The following facts are in dispute:

- What Knudsen meant by "fresh blood," (SUMF ¶¶ 18–21; RSUF ¶¶ 17(a)–21);

6

- What Brandgaard meant when he referred to the company as a "young organization," (SUMF ¶¶ 21–23; RSUF ¶¶ 22–23);

- Whether Knudsen told Wright that he wanted to "prune" his team, (SSMF ¶ 23; RCMF ¶ 23);

- Which supervisors were involved in removing Plaintiff from his 2013 Action Plan, (SUMF ¶¶ 64–68, 74; RSUF ¶¶ 64–68, 74);

- Whether the deficiencies identified by Hicks in Plaintiff's 2014 mid-year performance rating were "legitimate deficiencies and/or concerns," (SUMF ¶¶ 75–79; RSUF ¶¶ 75–79);

- Whether the performance deficiencies identified by Hicks in Plaintiff's 2014 end-year review were "legitimate deficiencies and/or concerns," (SUMF ¶¶ 82–89; RSUF ¶¶ 82–89);

- Whether Hicks actually "felt" that "Plaintiff was unable to demonstrate an understanding of basic procurement concepts," or that "Plaintiff needed extensive guidance and instruction from other members of the Procurement Department to complete projects or tasks," (SUMF ¶¶ 90–93; RSUF ¶¶ 90–93);

- Whether Hicks actually "felt" that "Plaintiff had not sufficiently improved in exercising his analytical skills and independently producing results in projects requiring those skills," (SUMF ¶ 103; RSUF ¶ 103);

- Whether Plaintiff failed to complete the project's requirements under Plaintiff's second Action Plan, (SUMF ¶¶ 104–108; RSUF ¶¶ 104–108);

- Whether the total cost of ownership equation Plaintiff was required to complete and submit to Hicks was "incomplete and inaccurate" or a "'draft' and 'work in progress,'" (SUMF ¶¶ 112–118; RSUF ¶¶ 112–118); and

- Whether Knudsen played a role in Plaintiff's termination, (SUMF ¶ 126; RSUF ¶ 126).

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate if the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). A fact is material if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v.*

7

*Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 249.

In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002). On a motion for summary judgment, a court's "function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine [dispute] for trial." *Anderson*, 477 U.S. at 248.

### III. DISCUSSION

Plaintiff brings a three-count Complaint against Defendant, alleging violations of the ADEA, NJLAD, and 42 U.S.C. § 1981: Count One, a claim of age discrimination, pursuant to the ADEA and NJLAD (Compl. ¶¶ 25–28); Count Two, a claim of unlawful retaliation pursuant to the ADEA and NJLAD (Compl. ¶¶ 29–32); and Count Three, a claim of unlawful retaliation pursuant to the NJLAD and 42 U.S.C. § 1981 (Compl. ¶¶ 33–36). Defendant moves for summary judgment on all claims. (*See generally* Def.'s Mot.)

#### A. Age Discrimination

##### 1. Statutory Framework

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, the NJLAD provides that "[a]ll persons shall have the opportunity to obtain employment . . . without discrimination because of . . . age[.]" N.J. Stat. Ann. § 10:5–4.

To prevail on an ADEA claim, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer

decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141–43 (2000)). Direct evidence is evidence which, "if believed, would prove the existence of the fact [in issue] *without inference or presumption.*" *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (alteration and emphasis in original) (citation and internal quotation marks omitted). Indirect evidence is such that "the trier of fact must *infer* the discrimination on the basis of age from an employer's remarks." *Id.* (emphasis in original) (citation omitted).

In general, to establish a prima facie case under the NJLAD for unlawful termination, and thus satisfy the first step of the burden shifting analysis, a plaintiff must demonstrate that he or she: (1) belongs to a protected class; (2) was qualified for the position held; (3) was terminated despite adequate qualifications; and (4) after termination the position remained open and the employer continued to seek applications. *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 301 (3d Cir. 2004) (citation omitted).

To establish a prima facie case for age discrimination under the ADEA or NJLAD[2] through indirect evidence under the *McDonnell Douglas* framework, a plaintiff must demonstrate the existence of the following elements by a preponderance of the evidence: "(1) [that he] belongs to a protected class, *i.e.*, is at least 40 years of age; (2) was qualified for the position; (3) was dismissed despite being qualified; and (4) was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination." *Gray v. N.Y. Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (collecting cases); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (articulating elements of prima facie case of unlawful discrimination and establishing the

---

[2] A claim brought by a plaintiff under the NJLAD is generally analyzed under the same mechanism as a claim brought under the ADEA. *See Monaco*, 359 F.3d at 299–302.

burden-shifting paradigm). "A prima facie case creates an inference of unlawful discrimination." *Id.*

Under the burden-shifting framework outlined in *McDonnell Douglas*, after the plaintiff has established a prima facie case, there arises a presumption of discrimination, and the burden shifts to the defendant-employer to provide a "legitimate business reason" for the plaintiff's termination. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *see McDonnell Douglas Corp.*, 411 U.S. at 802–06. If the defendant-employer is able to articulate a legitimate business reason, the presumption of discrimination is eliminated, and the burden shifts back to the plaintiff to advance evidence that the proffered reason is a "pretext for what, in reality, was a discriminatory business motivation." *Barber v. CSX Dist. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995). "Pretext may be proved either 'directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Gray*, 957 2d. at 1078 (collecting cases). "Pretext is not demonstrated by showing simply that the employer was mistaken . . . . Instead, the record is examined for evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995) (citations omitted).

The Third Circuit has stated that the Court's role is to "sit in judgment" of the plaintiff's "alleged discrimination, not of [the defendant's] managerial competence or the clarity of its communications with its employees." *Harding v. Careerbuilder, LLC*, 168 F. App'x 535, 538–39 (3d Cir. 2006). "It is no violation of the ADEA to fire an employee for failure to meet performance targets . . . ." *Id.* at 539.

The record does not reflect, and Plaintiff does not argue, that there exists direct evidence of age discrimination. (Pl.'s Opp'n Br. 4–6.) Plaintiff must, therefore, establish a prima facie case of discrimination through indirect evidence under the *McDonnell Douglas* framework. *Gray*, 957 F.2d at 1078.

### 2. Summary Judgment Must be Granted in Favor of Defendant on Count One.

Defendant "does not challenge whether Plaintiff can make out a prima facie case" of age discrimination. (Def.'s Mot. 7 n.1.) Defendant, however, advances several legitimate business reasons for Plaintiff's termination. Specifically, Plaintiff was placed on several action plans and did not demonstrate improvement in his work.

Plaintiff does not dispute that during his 2012 mid-year review, he received his first notification from Knudsen, his then-immediate supervisor, that "his savings for the first half of 2012 were below expectations," although Plaintiff disputes in his deposition whether his savings were in fact below expectations. (SUMF ¶ 26; RSUF ¶ 26.) In February 2013, Plaintiff received an "Approaches Expectations" rating on his 2012 year-end review from another supervisor, Houtz. (SUMF ¶¶ 29, 36–39; RSUF ¶¶ 29, 36–39.) Houtz placed Plaintiff on a formal Action Plan in response to his 2012 performance. (SUMF ¶ 41; RSUF ¶ 41.) Then, despite giving Plaintiff a "Meets Expectations" rating in his 2013 year-end evaluation, Hicks expressed serious concerns in 2014 that Plaintiff was unable to perform the capabilities attendant to his position. (SUMF ¶¶ 68, 82–89; RSUF ¶¶ 68, 82–89.) On February 18, 2015, Hicks gave Plaintiff a verbal warning and put him on a second formal Action Plan. (SUMF ¶¶ 90–91; RSUF ¶¶ 90–91.) It is undisputed that during this time, Plaintiff "generally" met with Hicks once every week and was provided feedback on his progress. (SUMF ¶ 102; RSUF ¶ 102.) The record reflects that Hicks subsequently advanced

Plaintiff from the Action Plan to a PIP, and also gave him a written warning after finding his performance inadequate. (SUMF ¶¶ 103–08; RSUF ¶¶ 103–08.)

Defendant maintains that the total cost of ownership equation Plaintiff was required to submit as a part of completing his second Action Plan was "incomplete and inaccurate," while Plaintiff states it was a "draft" and "work in progress." (SUMF ¶¶ 112–17; RSUF ¶¶ 112–17.) For these and other reasons, on August 6, 2015, Hicks met with Plaintiff and a Human Resources representative to advise Plaintiff of his termination. (SUMF ¶ 127; RSUF ¶ 127.) The above evidence demonstrates that Defendant has advanced legitimate, documented business reasons for Plaintiff's termination.

Plaintiff does not dispute that the record reflects that his supervisors had identified deficiencies in his performance, but disputes whether Hicks'[s] reservations were "legitimate deficiencies and/or concerns." (RSUF ¶¶ 82–89; SUMF ¶¶ 82–89.) Plaintiff does not dispute that Hicks "stated" that Plaintiff had "not sufficiently improved in exercising his analytical skills and independently producing results in projects requiring those skills," but does dispute whether Hicks actually "felt" that Plaintiff's performance was inadequate, (RSUF ¶ 103; SUMF ¶ 103), and whether Hicks'[s] concerns were "legitimate and/or honestly maintained," (RSUF ¶ 107; SUMF ¶ 107). Plaintiff's disagreement with Defendant's business evaluations is not enough to create a genuine dispute of material fact as to whether Defendant's lengthy and well-documented negative performance reviews were a pretext for age discrimination.

Plaintiff also contends that Defendant's actions were pretextual by relying on prior positive performance reviews from 2006 to 2011. (Pl.'s Opp'n Br. 8–10; *see, e.g.*, Pl.'s RSUF ¶¶ 82, 88.) This approach is unavailing. That a plaintiff has previously performed well in a role does not prove that the plaintiff has performed well recently. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 474 (3d Cir.

2005) ("The attempt to use past positive performance reviews to show that more recent criticism was pretextual fails as a matter of law."); *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations.").

Plaintiff further relies on three comments to establish pretext: the 2012 comments made by Knudsen regarding "fresh blood," and "pruning the workforce," and the comment made by Brandgaard that Novo Nordisk A/S was a "young company." (SUMF ¶¶ 13, 18, 21; RSUF ¶¶ 13, 18, 21.) Plaintiff is unable to demonstrate that the "but-for" cause of his termination was age discrimination through these comments. While a credibility determination as to the intended meaning of "fresh blood" or "pruning the workforce" would be the purview of the factfinder, "stray remarks by non-decisionmakers or by decision[-]makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Fuentes*, 32 F.3d at 767 (citing *Ezold*, 983 F.2d at 545). It is undisputed that neither "Hicks nor Mr. Houtz ever spoke to Mr. Brandgaard about Plaintiff," and that "[t]here's no evidence Brandgaard even knew who Plaintiff was." (SUMF ¶ 72; RSUF ¶ 72.) Three stray comments made three years before Plaintiff's termination by decisionmakers residing in Denmark, one of whom was likely unaware of Plaintiff's existence and another who had stopped supervising Plaintiff a year earlier, are not enough to raise a genuine dispute of fact. *See Hodczak v. Latrobe Specialty Steel Co.*, 451 F. App'x 238, 241 (3d Cir. 2011) (holding that temporally remote statements made by company executives qualified as "stray remarks" and were entitled to minimal weight.)

Because Plaintiff has not shown "either that [D]efendant's proffered justifications are not worthy of credence *or* that the real reason for the decision was discrimination," *Torre*, 42 F.3d at 832 (citing *Fuentes*, 32 F.3d at 764), Plaintiff's age discrimination claim under the ADEA and NJLAD fails. The Court, accordingly, grants Defendant's motion for summary judgment as to Count One.

### B. Retaliation Claims[3]

Plaintiff avers in Count Two, brought under the ADEA and NJLAD, that Defendant impermissibly retaliated against Plaintiff by terminating him because Plaintiff "complained of Knudsen's ageist comments." (Pl.'s Opp'n Br. 12.) Plaintiff avers in Count Three, brought under the NJLAD and § 1981, that Defendant retaliated against him for opposing a "racially offensive remark to Wright." (See Pl.'s Opp'n 12; Compl. ¶¶ 20, 33–36; Pl.'s SSMF ¶ 75; Def.'s RCMF ¶ 75.)

To state a prima facie case of retaliation, a plaintiff must show "(1) that [the plaintiff] engaged in a protected employee activity; (2) that [the plaintiff] was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that

---

[3] The Court finds that, to the extent Plaintiff asserts retaliation claims as to the 2012 action under the ADEA or NJLAD, those claims are time-barred. A plaintiff seeking to pursue a claim under the ADEA must file a complaint with the EEOC within three-hundred days of the alleged adverse action "before he or she may bring suit on those claims in federal court." *Ventura v. Montclair State Univ.*, No. 08-5792, 2011 WL 6339656, at *8 (D.N.J. Dec. 19, 2011) (citing *Bihler v. Singer Co.*, 710 F.2d 96, 97 (3d Cir. 1993); *see* 29 U.S.C. § 626(d). Additionally, claims under the NJLAD are subject to a two-year statute of limitations. *Montells v. Haynes*, 627 A.2d 654, 660–61 (N.J. 1993). Because Houtz was hired as Plaintiff's supervisor on June 4, 2012, and because Plaintiff did not file a complaint with the EEOC until November 3, 2015, Plaintiff is unable to rely on the 2012 adverse action to state a claim under ADEA. (SUMF ¶ 24; RSUF ¶ 24; Compl. ¶ 10.) Similarly, Plaintiff is barred from filing a claim under NJLAD, as the two-year statute of limitations expired two years after the date of Defendant's decision not to promote Plaintiff, in June 2014. *Montells*, 627 A.2d at 656, 660–61; (SUMF ¶ 24; RSUF ¶ 24).

14

there is a causal connection between the protected activity and the adverse action." *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (citation omitted).[4]

On the first prong, "[a] person has engaged in 'protected conduct' when [the person] 'has opposed any practice made unlawful by . . . [§ 623].'" *Barber*, 68 F.3d at 702 (quoting 29 U.S.C. § 623(d)). The anti-retaliation provision of the ADEA makes it unlawful for "an employer to discriminate against any of [its] employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

For an employer's acts to "satisfy the second prong of a prima facie case of retaliation, the plaintiff 'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 195 (3d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

---

[4] The retaliation analysis is the same under the ADEA, NJLAD, and § 1981. The Third Circuit has held that state statutes with provisions substantially similar to the ADEA are to be "interpreted as identical to federal anti-discriminations laws except when there is something specially different in its language requiring that it be treated differently." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) (citing *Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996)). Since, as in *Fogleman*, there is no argument by either party that the ADEA and the NJLAD should be evaluated under different standards in this case, the Court will apply the same standard to discuss both claims. *Id.* Under the NJLAD, the Court must "assess discrimination claims supported by circumstantial evidence under the *McDonnell Douglas* standard, 'while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276–77 (1989) (O'Connor, J., concurring)." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)). Section 1981 retaliation claims consider the same three factors, except there must also be an underlying § 1981 violation. *See Estate of Oliva ex rel McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010).

Regarding the third prong, "[t]o demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if 'unusually suggestive.'" *Id.* at 196 (citation omitted). In evaluating whether a causal connection exists, the Court "considers 'a broad array of evidence.'"[5] *LeBoon v. Lancaster Jewish Cmty. Ctr.*, 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)). "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (quoting *Burrus v. United Tele. Co.*, 683 F.2d 339, 343 (10th Cir. 1989)). "[T]emporal proximity alone [is] insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive,' . . . nineteen months [is] too attenuated to create a genuine issue of fact." *Farrell*, 206 F.3d at 280 (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)). "Where the temporal proximity is not 'unusually suggestive,' [the Court] ask[s] whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *LeBoon*, 503 F.3d at 232 (quoting *Farrell*, 206 F.3d at 280). "An employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity." *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014) (citing *Shaner v. Synthes*, 204 F.3d 494, 504–05 (3d Cir. 2000) (holding that because the record contained similar criticisms both before and after the filing of the EEOC complaint, there lacked a causal link between the complaint and adverse action)). After the establishment of a prima facie case of

---

[5] "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon*, 503 F.3d at 232–33 (citing *Farrell*, 206 F.3d at 279–81.)

retaliation, the *McDonnell Douglas* burden-shifting framework applies. *See Barber*, 68 F.3d at 701.

Plaintiff fails to state a prima facie case for retaliation under the ADEA and the NJLAD and, accordingly, Count Two fails. Plaintiff satisfied the first prong by filing a formal complaint with the Equal Employment Opportunity Commission ("EEOC") because "the statute provides that a person has engaged in 'protected conduct' when [the person] opposes discrimination on the basis of age." *Barber*, 68 F.3d at 702; (Compl. ¶ 10). Additionally, Plaintiff also engaged in protected activity through "informal protests of discriminatory employment practices, including making complaints to management." *Daniels*, 776 F.3d at 193; (SUMF ¶¶ 42–43; RSUF ¶¶ 42–43.)

As for the second element of a prima facie case of retaliation, Plaintiff alleges an adverse action in the form of his termination. *Fasold*, 409 F.3d at 188; (SUMF ¶ 127; RSUF ¶ 127). But as for the third element, Plaintiff has failed to sufficiently allege a causal connection between the protected activity and adverse action to present a genuine dispute of fact. Plaintiff is unable to assert intervening antagonism or retaliatory animus after his initial complaint to Human Resources on February 20, 2013. (SUMF ¶ 43; RSUF ¶ 43.) It is undisputed that neither Houtz nor Hicks ever made comments to Plaintiff that he felt were discriminatory, "[n]or did Plaintiff witness Mr. Knudsen or any other [Novo Nordisk] employee make any negative comments regarding age at any time after Mr. Hicks became Plaintiff's supervisor in July 2013." (SUMF ¶¶ 29, 60–61; RSUF ¶¶ 29, 60–61.) This evidence demonstrates the absence of an intervening or persistent antagonism, or retaliatory animus within the organization after Plaintiff initiated a complaint to Defendant in February 2013. (SUMF ¶ 43; RSUF ¶ 43.) Additionally, it is a high hurdle for a plaintiff to show retaliatory animus when he has received significant negative feedback before voicing complaints

to management. *Ross*, 755 F.3d at 195. Plaintiff had already received an "Approaches Expectations" and been placed on a formal Action Plan before he filed a complaint with Human Resources. (SUMF ¶¶ 34–41; RSUF ¶¶ 34–41.) To the extent there is a dispute in the record, it arises again from Plaintiff's disagreement with Defendant's business decisions. (*See, e.g.*, RSUF ¶¶ 39, 40.)

Plaintiff also fails to state a prima facie case for retaliation under the NJLAD and 42 U.S.C. § 1981 and, accordingly, Count Three fails.[6] Similar to Count Two, Plaintiff has failed to advance evidence of a causal connection between his opposing a racially offensive remark and his termination. *Fasold*, 409 F.3d at 188. Even if Plaintiff could state a prima facie case, he is unable to show that the legitimate business reasons advanced by Defendant were pretextual. *See Parson v. Vanguard Grp.*, 702 F. App'x 63, 68 (3d Cir. 2017) (holding that evidence that he did not receive negative reviews until he worked under his new supervisor, that the supervisor called the plaintiff by the name of another African-American employee, that 11 out of 13 employees fired or forced into retirement were African-American, or the existence of incorrect documentation of his productivity numbers was insufficient to establish a genuine dispute of material fact to support the defendant's motivations as pretextual).

Because Plaintiff is unable to advance any evidence to show that Defendant's reason for his termination were in fact prextextual, because his claims regarding Defendant's failure to promote him are time-barred, and because Plaintiff has failed to advance evidence to support his retaliation claims for termination, summary judgment must be granted in favor of Defendant.

---

[6] Because the Court finds that Plaintiff fails under the retaliation analysis, the Court declines to discuss whether there is an underlying § 1981 violation.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (ECF No. 29) is granted. The Court will enter an Order consistent with this Memorandum Opinion.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**